UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FRANCINE REGAL,                    )
                                   )
             Plaintiff,            )   CIVIL ACTION NO.
                                   )   14-12427-DPW
                                   )
        v.                         )
                                   )
WELLS FARGO BANK, N.A.             )
                                   )
             Defendant.            )

MEMORANDUM AND ORDER
September 7, 2016

     This is a civil action between plaintiff Francine Regal and
defendant Wells Fargo Bank, N.A. (apparently misidentified in
the Complaint as Wells Fargo Corporation), in which Regal
alleges that Wells Fargo violated federal and state laws in its
mortgage and subsequent foreclosure of a property she owned.
Wells Fargo has filed a motion to dismiss Regal's complaint
pursuant to Rule 12(b)(6) for failure to state a claim upon
which relief may be granted.

**I. BACKGROUND**

***A.   Factual Background***

     Francine Regal is the owner and occupant of a home in
Everett, Massachusetts.  [Regal Complaint, Dkt. No. 1, Exh. 1, ¶
1].  In August of 2004, she borrowed money from Lighthouse
Mortgage secured with an adjustable-rate mortgage on the

property.  [*Id.* ¶ 5].  The terms of this mortgage included a fixed rate of 4% for one year, followed by an adjustable rate thereafter.  [*Id.* ¶ 6].  The plaintiff asserts that the loan amount of $396,000 exceeded the value of the property, and, without providing any figures, that the monthly payments exceeded 50% of her monthly income.  [*Id.* ¶ 6].  Wells Fargo contends, however, and the plaintiff does not dispute the underwriter's appraisal, that the house was worth $420,000 at the time of the mortgage, and provides a worksheet with an estimate to support the contention.  *See* Wells Fargo Memorandum in Support of Motion to Dismiss, 203(K) Maximum Mortgage Worksheet, Dkt. No. 8, Exh. C.[1]

After the first year, the rate of the mortgage was adjustable by the mortagee, Lighthouse.  The rate was pegged to the United States Treasury Securities weekly average yield rate with a constant maturity of one year.  [Wells Fargo Memorandum in Support of Motion to Dismiss, Dkt. No. 8, 3].  This rate was

---

[1] Ordinarily, consideration of material such as this would not be permissible under Rule 12(b)(6).  However, the First Circuit has recognized some exceptions to that rule.  These exceptions include documents "the authenticity of which [is] not disputed by the parties," documents that are "central to plaintiffs' claim," and "documents sufficiently referred to in the complaint."  *Watterson* v. *Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).  Given that this material has not been disputed and is centrally relevant to consideration of whether or not the loan in question may have been predatory, I have chosen to reference it at this stage in the proceedings.

then added to a fixed baseline of 2.25%. [*Id.*].  At some point,
Lighthouse Mortgage was acquired by Wells Fargo Bank, N.A., the
defendant in this action, which assumed control over Regal's
mortgage in the process.

Regal thereafter defaulted on the mortgage. [*Id.*].  In an
effort to rehabilitate the mortgage, she submitted a Home
Affordable Mortgage Program ("HAMP") loan modification
application to Wells Fargo on June 20, 2011.  [*Id.*].  Wells
Fargo denied the HAMP application on February 20, 2012,
providing Regal with nothing by way of explanation.  [Compl. ¶
13].  Wells Fargo did, however, offer a repayment plan for the
loan, an offer that was rejected by Regal. [*Id.*].  Wells Fargo
then commenced foreclosure proceedings.  On May 8, 2014, Regal
filed the complaint initiating this action in the Middlesex
County Superior Court.  On June 9, 2014, Wells Fargo removed the
case to this Court.

## II. ANALYSIS

Regal's complaint alleges three claims for relief.  The
First Claim for Relief alleges that Wells Fargo violated its
duties under HAMP and its Servicer Participation Agreement with
the United States Department of the Treasury; Regal alleges that
in this connection she was injured as a third-party beneficiary
of the Agreement.  The Second Claim seeks relief under
Massachusetts General Laws Chapter 93A § 9.  Regal alleges that

3

Wells Fargo's failure to modify her loan under HAMP guidelines was an unfair and deceptive business practice giving rise to liability under Chapter 93A.  Regal's Third Claim for Relief alleges that Wells Fargo violated Chapter 93A § 2 in offering the loan originally, because the loan, as structured, was and is predatory within the meaning of Massachusetts consumer protection laws.  I will address all three claims, although in the opposition memo, plaintiff's counsel only presses the first. I take a comprehensive approach not only in the interests of completeness, but also specifically because the disbarment of plaintiff's attorney for misconduct in other mortgage foreclosure matters, *see* Note 4 *infra*, raises the specter of inadequate assistance of counsel in this case and consequently more judicial attentiveness appears warranted.

## A.  *Legal Standard*

In order to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'"

4

*Maldonado* v. *Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)

(quoting *Iqbal*, 129 S.Ct. at 1949).  I "must accept all well-

pleaded facts alleged in the Complaint as true and draw all

reasonable inferences in favor of the plaintiff." *Watterson* v.

*Page*, 987 F.2d 1, 3 (1st Cir. 1993).  While I am "generally

limited to considering facts and documents that are part of or

incorporated into the complaint," I "may also consider documents

incorporated by reference in the [complaint], matters of public

record, and other matters susceptible to judicial notice."

*Giragosian* v. *Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation

and internal quotation marks omitted) (alteration in original);

*see also* Note 1 *supra*.

## B.    *Third-Party HAMP Claim*

In her First Claim for Relief, Regal asserts that she is an

intended third-party beneficiary of the Service Participation

Agreement Wells Fargo signed to recognize its undertaking with

Treasury to abide by HAMP guidelines in restructuring eligible

loans.  She argues that, because she met the requirements for

eligibility under HAMP, Wells Fargo's refusal to modify her loan

constitutes a violation of HAMP and a breach of the SPA.

Attendant on this argument is the proposition that, if the

denial of refinancing is indeed a violation, then, as an

intended third party beneficiary of the SPA, Regal is entitled

to damages as a result of Wells Fargo's purported breach.

In order to analyze Regal's claim, it will be useful first to examine the history of HAMP and its related programs. HAMP is a subpart of the Making Home Affordable Program, enacted in February 2009 as part of the government's response to the financial crisis. "The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default"; this is to be done by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt." *Bosque* v. *Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342 (D. Mass. Jan. 26, 2011).

Many banks that owned or serviced home mortgages (including Wells Fargo) agreed to modify terms of eligible mortgages in exchange for billions of dollars from the United States government through the Trouble Asset Relief Program ("TARP"). In order to qualify to participate in the program for loans not owned, securitized or guaranteed by Fannie Mae or Freddie Mac (i.e. owned, securitized, or serviced by financial institutions that are not government-sponsored enterprises ("GSEs") like Fannie Mae and Freddie Mac), these banks were required to sign Servicer Participation Agreements ("SPAs") that committed the banks to certain standards with respect to refinancing of eligible loans in exchange for incentive payments for successful refinancings. The SPAs are contracts between each bank and the Department of the Treasury, which promulgates rules under HAMP

6

as to how banks should refinance home mortgages so as to avoid unnecessary foreclosures.  The banks solicit refinancing applications from potentially-eligible individual mortgagors, and make a determination as to whether or not to offer them refinancing.

The question of what rights HAMP gave individual homeowners was, at the outset, not well understood.  At least one Massachusetts Superior Court Judge concluded that homeowners seeking to refinance their mortgages under HAMP guidelines were intended third-party beneficiaries to SPAs between Treasury and banks.  *See Parker* v. *Bank of Am., N.A.*, No. 11-1838, 2011 WL 6413615 (Mass. Super. Ct. Dec. 16, 2011).  However, that interpretation, as recognized by the Superior Court judge in *Parker*, *id.* at 7, stands contrary to the consensus among courts in this District and elsewhere that Congress never intended to give homeowners a private right of action under HAMP or any of its related programs.  "Although HAMP was generally designed to benefit homeowners, it does not follow necessarily that homeowners like the plaintiff[] are intended third-party beneficiaries of the contracts between servicers and the government."  *Teixeira* v. *Fed. Nat'l Mortg. Ass'n*, No. 10-cv-11649, 2011 WL 3101811, at *2 (D. Mass. July 18, 2011) (*citing Klamath Water Users Protective Ass'n* v. *Patterson*, 204 F.3d 1206, 1212 (9th Cir. 1999)).

7

The First Circuit adopted this consensus approach in *MacKenzie* v. *Flagstar Bank, FSB*, 738 F.3d 486 (1st Cir. 2013), where the MacKenzies, commenced an action against Flagstar Bank after the bank initiated foreclosure proceedings against them.

The First Circuit concluded that HAMP did not provide a private right of action to aggrieved borrowers.  The court decided that the standard HAMP SPAs do "'not give any indication that the parties intended to grant qualified borrowers the right to enforce the contract.'"  *MacKenzie*, 738 F.3d at 492 (1st Cir. 2013) (quoting *Teixeira*, 2011 WL 3101811, at *2).

This approach aligns with the general presumption that government contracts ordinarily do not give private citizens the right to sue as third-party beneficiaries.  As a result, "it would be unreasonable for a borrower to rely on the HAMP guidelines as evidence of intent to extend a right of enforcement to third-party beneficiaries. . . ."  *Markle* v. *HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172, 182 (D. Mass. July 12, 2011).  If homeowners "were third-party beneficiaries, every homeowner-borrower in the United States who has defaulted on mortgage payments or is at risk of default could become a potential plaintiff."  *Id.*

This case is no exception.  The SPA Wells Fargo signed with Treasury, Fannie Mae and Freddie Mac, included a provision identifying those to whom the agreement applies.  The SPA here

was expressly intended to "inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest."  Nothing in the contract at issue, and nothing in HAMP more generally, provides a basis for concluding that servicers, banks or the government intended that homeowners like Regal were entitled to sue under HAMP or the SPAs.  Regal may have sought to benefit from the contract between Treasury and Wells Fargo, but there is nothing to indicate that she was an intended beneficiary, with an interest cognizable in litigation.  Therefore, to the extent that she relies on HAMP directly for any particular federal cause of action, such a claim fails, and must be dismissed.

The question whether violations of HAMP guidelines can serve as part of the underlying basis for a separate state law claim, however, is a distinct matter to which I now turn.

## C.  *Massachusetts General Laws Chapter 93A Claim*

In her complaint, Regal asserts two separate claims – (1) a HAMP violation and (2) a predatory loan violation – under Chapter 93A of the Massachusetts General Laws.  Overall, Chapter 93A is a consumer protection law that prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. L. c. 93A § 2.  The statute provides a private right of action for individuals to assert claims if they believe they have been wronged by such a deceptive practice.

*Id.* at § 9.  "Chapter 93A is 'a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.'"  *Kattar* v. *Demoulas*, 433 Mass. 1, 12, (2000) (quoting *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975).  What is unfair or deceptive requires careful analysis; "Massachusetts courts evaluate unfair and deceptive trade practice claims based on the circumstances of each case." *Massachusetts Eye and Ear Infirmary* v. *QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir. 2009) (citing *Kattar*, 433 Mass. at 12).

1.   HAMP Violations and Chapter 93A

In proving a violation of Chapter 93A, "it is neither necessary nor sufficient that a particular act or practice violate common or statutory law." *Id.*  Accordingly, "a violation of HAMP that is deceptive or unfair *could* create a viable claim for relief under Chapter 93A." *Morris* v. *BAC Home Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 259 (D. Mass. 2011) (emphasis added).  But when a statute, like HAMP, "does not provide a private means of recovery, for a cause of action pursuant to chapter 93A to proceed, the violation must be determined to be unfair or deceptive in and of itself." *Ording* v. *BAC Home Loans Servicing, LP*, No. 10-cv-10670-MBB, 2011 WL 99016 (D. Mass. 2011).  Therefore, as succinctly outlined by Magistrate Judge Bowler in *Ording* and adopted by Judge Saris in

10

*Morris*, the relevant interplay between HAMP and Chapter 93A

focuses on three factors:

> (1) have plaintiffs adequately plead that defendant
> violated HAMP; (2) are those violations of the type that
> would be independently actionable conduct under chapter
> 93A even absent the violation of a statutory provision
> (i.e. are the violations unfair or deceptive); and (3)
> if the conduct is actionable, is recovery pursuant to
> chapter 93A compatible with the "objectives and
> enforcement mechanisms" of HAMP?

*Ording*, 2011 WL 99016, at *7.

> a.   *Has Plaintiff Adequately Pled that Defendant
>      Violated HAMP?*

The alleged injury that is said to give rise to Chapter 93A

liability is failure by Wells Fargo to offer Regal a loan

modification offer (or give her a reason for the rejection of

her request) even though she qualified under HAMP.  The

requirements for HAMP eligibility are as follows: the mortgage

must be a first lien mortgage that originated on or before

January 1, 2009, the mortgage must be delinquent or default

reasonably foreseeable, the current unpaid principal balance

must be less than a certain amount of money for a given type of

property, the required monthly payments on the mortgage must

exceed 31% of the homeowner's monthly income, and the property

must not be condemned.  See *Home Affordable Modification Program

Guidelines*, United States Department of the Treasury (Aug. 30,

2016 3:48 PM), *available at* https://www.treasury.gov/press-

center/pressreleases/Documents/modification_program_guidelines

11

.pdf.  If the servicer determines that the borrower's mortgage meets those criteria, the servicer must also subject each applicant's information to "Net Present Value (NPV) Testing". *Making Home Affordable Handbook v 5.1*, Home Affordable Modification Program (Aug. 30, 2016 3:52 PM), 84-85, *available at* https://www.hmpadmin.com/portal/programs/guidane.jsp# archive4, 2-4.  Essentially, this test determines whether or not the loan modification would be an economically efficient and desirable transaction.

If the borrower is determined to be ineligible, or if the NPV calculation is not "net-positive", the servicer must attempt to provide other refinancing options.  If those fail, the servicer may commence foreclosure proceedings.  *Making Home Affordable Handbook v 3.3* at 62, 85.  If servicers reject a borrower's request and find her ineligible, they must send the borrower a Borrower Notice.  *See Supplemental Directive 09-08: Borrower Notices*, Home Affordable Modification Program (Aug. 30, 2016, 4:01 PM), *available at* https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd09 08.pdf.  These Notices are required to contain certain points of information, most relevantly the reasoning behind the servicer's denial of the HAMP loan modification.  This anticipates an explanation of why or how the borrower does not pass the complicated Net Present Value Test.

12

Regal's complaint contains sufficient allegations to form the basis for a claim that Wells Fargo violated the Borrower Notice requirement of HAMP's supplemental directives.  While Wells Fargo did attempt to negotiate a different kind of repayment plan with Regal, it was also obligated to provide her with a detailed explanation of why it denied her original HAMP application and that it allegedly did not do.

> b.    *Would Treating Departures from HAMP Requirements as Actionable Chapter 93A Claims Be Compatible with the Objectives of HAMP?*

Before analyzing whether or not an inadequate notice departure from HAMP directives is sufficiently deceptive or unfair to merit consideration as a violation of Chapter 93A, I must first consider whether giving borrowers private rights of action under Chapter 93A would as a general proposition frustrate or conflict with the purpose of HAMP.  "The goal of HAMP is to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt." *Bosque*, 762 F. Supp. 2d at 347.  This entails, predominantly, the payment incentive program on which HAMP depends, providing incentive payments to servicers for refinancing eligible loans.

HAMP is a kind of consumer protection program, and compliance with consumer protection laws would seem to further

the goal of protecting vulnerable borrowers.  And, although
Fannie Mae and Freddie Mac are technically responsible for
oversight and enforcement of the program, it could not be said
that encouraging compliance with such laws through state private
rights of action would frustrate the purpose of HAMP or inhibit
the ability of the responsible entities separately to enforce
its provisions against participating financial institutions.  In
Wells Fargo's SPA, the bank itself covenanted that it would
"develop and implement an internal control program to monitor
and detect loan modification fraud and to monitor compliance
with applicable consumer protection and fair lending laws. . .
."  *Wells Fargo Service Participation Agreement*, United States
Department of the Treasury (Aug. 30, 2016, 6:42 PM), B-4,
*available at* https://www.treasury.gov/ initiatives/financial-
stability/TARP-Programs/housing/mha/
Documents_Contracts_Agreements/wellsfargobankna_Redacted.pdf.
There is no basis to conclude that Treasury believes that
compliance with non-HAMP consumer protection laws is an obstacle
to or in frustration of the goals of HAMP.  Consequently, I am
satisfied that enforcement of at least some HAMP obligations
through consumer protection laws such as Chapter 93A would not
necessarily frustrate the purpose of HAMP.

14

     *c.    Is the Departure from HAMP Directives Alleged Here*
         *Independently Actionable?*

Turning to application of Chapter 93A to the HAMP directive at issue here, I begin by observing that the violation of HAMP must be a deceptive or unfair practice leading to remedies under Chapter 93A in its own right, not just as a violation of HAMP. In other words, I address the question whether simply because Wells Fargo did not fully comply with some requirements of Treasury with regard to HAMP compliance regarding notice to borrowers necessarily means that the conduct violates Chapter 93A's consumer protection provisions.  To do so, the conduct must be independently deceptive or unfair under the standard established for Chapter 93A for such practices.

The standard for violations of Chapter 93A is not readily apparent from the statutory language.  However, courts have decided that

> In determining whether a practice violates Chapter 93A,
> we look to '(1) whether the practice . . . is within at
> least the penumbra of some common-law, statutory, or
> other established concept of unfairness; (2) whether it
> is immoral, unethical, oppressive, or unscrupulous;
> [and] (3) whether it causes substantial injury to
> consumers (or competitors or other businessmen).

*Massachusetts Eye and Ear*, 412 F.3d at 243 (quoting *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).  Courts may also take into account "[w]hat a defendant knew or should have known" and a plaintiff's "conduct, his knowledge, and what

he reasonably should have known." *Swanson* v. *Bankers Life Co.*, 389 Mass. 345, 349 (1983).

The only violation of HAMP or the SPA alleged by Regal is the failure to send her Notice to explain the reasoning behind the denial of her HAMP modification.  She has not alleged sufficiently that she qualified for a HAMP modification because nowhere does she indicate that her NPV calculation would have been "net positive".  I note that presenting this information is not a particular hardship; calculating the NPV of a modification for HAMP purposes is made simple online, and she herself possesses all the necessary information inputs.  *See Net Present Value Calculator*, Making Home Affordable (Jan. 15, 2016, 12:38 PM), https://www.makinghomeaffordable.gov/get-answers/pages/get-answers-tools-NPV.aspx.

Thus, the only question presented here for determination that could lead to Chapter 93A liability for a HAMP violation by Wells Fargo is whether the bank's failure to send a Borrower's Notice to Regal constitutes a departure from HAMP rules sufficient to reach the level of "unfair" or "deceptive" conduct to violate Chapter 93A.

The first factor of the test found in *PMP Assocs.* is at least facially satisfied.  HAMP regulations and directives take into account concepts of fairness with regard to borrower loan modification.  However, the allegation fails with respect to the

16

second and third factors.  There is nothing inherently "immoral, unethical, oppressive, or unscrupulous" about failing to send a notice that a borrower was denied a modification under a particular statutory regime.  The lack of notice was not part of some artifice designed to get the better of the consumer.  It is more akin to a simple remedial error.  The allegation also fails the third prong of the test.  Perhaps, if Regal had sufficiently alleged that she was qualified for and entitled to a modification, she could allege some sort of injury (i.e. the denial of a modification to which she was entitled).  However, she has not done so, and the only injury she alleges is a formal failure to send a Borrower's Notice.

As important as Borrower's Notices are to the necessary task of keeping borrowers well-informed as to their rights under HAMP, I cannot say that a bank's failure to send one is somehow sufficiently unfair or deceptive as to give rise to Chapter 93A liability.  Enforcement of such an oversight is best left to the government entities overseeing HAMP, not individuals bringing consumer protection suits in the absence of meaningful injury.

I conclude that Regal's Second Claim for Relief, the Chapter 93A claim predicated on a violation of HAMP guidelines, should be dismissed.

2.   Chapter 93A Prohibition of Predatory Loans

Regal's Third Claim for relief rests on the prohibition against predatory loans in Chapter 93A's case law.  She alleges that the loan's original structure, when offered by Lighthouse in 2004, was predatory in nature.  Under Chapter 93A, a loan will be regarded as predatory if it meets the standard articulated in *Commonwealth* v. *Fremont Investment & Loan*, 452 Mass. 733 (2008).

In *Fremont*, the Attorney General of Massachusetts pursued an action on behalf of the state and its citizens against a bank that had been offering subprime loans to homeowners.  Fremont was accused of extending high adjustable rate loans to high-risk homeowners under terms it knew would all but ensure that the homeowner could not pay the loan back.  Fremont would then sell the payment rights on these loans in the secondary market, to be bundled into securities packages.  At least 20% of the mortgages originated by Fremont had defaulted.  The Attorney General alleged that the bank's loan practice was unfair and deceptive under the meaning of Chapter 93A, and successfully sought a preliminary injunction from Justice Gants then sitting in Superior Court to forestall any pending foreclosure proceedings without the consent of the Attorney General.

The Supreme Judicial Court on appeal adopted the factors that Justice Gants used to define a predatory or unfair loan

under Chapter 93A.  In *Fremont*, Justice Gants articulated a set of definable criteria that the Supreme Judicial Court accepted as appropriate indicia of a predatory loan in violation of Chapter 93A.  These factors "operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely – an assumption that . . . logic and experience had already shown . . . to be unreasonable." *Fremont*, 452 Mass. At 743.

Under these criteria, loans are predatory and "presumptively unfair" if they contain some "combination of the following four characteristics":

> (1) the loans were A[djustable] R[ate] M[ortgage] loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had [the lender] measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty . . . or a prepayment penalty that extended beyond the introductory rate period.

*Id.* at 739.

Of course, even if a loan falls into Chapter 93A's definition of a predatory loan, a plaintiff's claim is still limited by Chapter 93A's general four-year statute of limitations.  *See* Mass. Gen. Laws ch. 260, § 5A.  "A cause of

action generally accrues at the time of the plaintiff's injury.

. . ." *Salois* v. *Dime Sav. Bank of New York, FSB*, 128 F.3d 20,

25 (1st Cir. 1997).  This statute of limitations may be tolled

in fraudulent concealment situations where "a plaintiff has been

injured by fraud and remains in ignorance of it without any

fault or want of diligence or care on his part." *Id.* (citations

omitted).  However, this tolling option is not available to

plaintiffs for whom sufficient facts "were available to place

plaintiffs on inquiry notice of fraudulent conduct." *Id.* at 26.

Again, in the interests of completeness, I will analyze

whether the plaintiff here has adequately alleged a predatory

loan claim in Section II.C.a before addressing the statute of

limitations claim in Section II.C.b.

> a.   *Has Plaintiff Adequately Pled a Predatory Loan Under*
>      *Fremont*

In addressing this question, I must carefully analyze the

terms of the loan as offered to Regal by Lighthouse.  Regal

entered into the loan agreement on August 27th, 2004.

[Complaint, Ex. A, 1].  The original rate of the loan was 4%.

Commencing on October 1, 2005, every year on that date,

Lighthouse or, later, Wells Fargo, could adjust the interest

rate based on an index.  That index took a baseline rate of

2.25% of the unpaid principal, and added the weekly average

yield on U.S. Treasury Securities at a maturity of one year,

then rounded to the nearest .125%.  The new rate would be applied to the outstanding principal, with the resulting number divided into as many monthly payments remaining between the adjustment date and the maturity date.  This change could not exceed a total adjustment of 1% for any given year, and was not to exceed a 5% change in total above or below the original 4% rate.  The original loan was for $396,500 on a property valued at $420,000 at the time of origination. [Complaint, at 18; Defendant Memo at 3, n. 4].  Regal has not provided any information with regard to her own finances, except to assert (without factual allegations concerning a matter over which she plainly has complete access) that the monthly payments at times exceeded her monthly income. [Complaint ¶ 31].  The pleadings do not provide any information as to whether or not the rate was actually adjusted and, if so, to and from what.

The first sign of an unfair loan is one in which the rate is adjustable with an introductory rate period of three years or less.  Here, this sign was a clearly visible.  The loan rate switched from the introductory rate to the adjustable, indexed rate just over a year after the origination of the loan, a change that signifies a predatory loan.

Analysis of the second factor is more complicated.  At first blush, it appears that there is no prohibition in the loan terms to the rate exceeding 3% of the original rate.  The only

21

protection in that regard is that the loan was not to exceed 5%
above the original rate.  Regal has provided no allegation as to
what the rate ended up being during any potential adjustment
period.  However, one can calculate the upper limits of what the
rate *could have been* during the loan period to determine whether
or not a potential rate adjustment *could have* met the conditions
required under the second prong of the *Fremont* test.  The
baseline rate is 2.25%.  But the amount above that baseline
could fluctuate significantly (with Treasury bond rates) if
Wells Fargo decided to adjust the rate in October of every year,
as was its right under the terms of the mortgage.  In order for
the mortgage to run afoul of *Fremont* and be considered
predatory, the mortgage rate must have had the potential, at
some point, to climb above 7% (3% above the original rate of
4%).  Regal conclusorily alleges that it rose to 9%, but
provides no plausible basis to support such an allegation (other
than the idea that this is, conceivably, as high as the terms of
the mortgage would have allowed the rate to rise).  But it is
the potential at the time the mortgage was executed for the rate
to reach the designated cap or fully indexed rate of 9% that
governs.

Nevertheless, I observe by way of illustrating the lack of
actual damages, that to reach the potential would have required
that the average yield of a treasury bond with a one-year

22

maturation period at some point be 6.75%.  Treasury bond yields
never rose to this level during the period following execution
of the mortgage.

The highest rate that could have been used as an adjustment
figure above the baseline rate (the "most recent Index figure
available 30 days before the Change Date" of October 1; i.e. the
Treasury rate on September 1) was 4.99% on September 1, 2006,
the second year the mortgage could be adjusted to the new index
rate.  The rate at that time the year before was 3.66%.  This
means that, using index calculations as specified in the
mortgage contract, the rate could have been adjusted to 5.875%
(rounding to the nearest .125%).  However, the mortgage terms
contain a 1% annual change cap, meaning that the rate could only
be adjusted to 5% that year, well within the 3% above 4%
required for a loan to be considered presumptively predatory
under this prong.  The next year, the Treasury rate was even
higher, but, again, the rate could only have gone up to 6%
because of the cap.  In 2007, the relevant rate to be used for
the adjustment was 4.19%.  This number would have allowed an
adjustment to 6.5%, still below the 7% required to meet the
*Fremont* test.  The next year, 2008, the rate plunged to 2.12%.
In 2009, the September 1 rate was .43%; in 2010, .25%; in 2011,
.1; in 2012, .16%; in 2013, 13%; in 2014, .09%; in 2015, .39%;
and in 2016, .60%.  This is all to show that, unless Wells Fargo

violated the terms of the mortgage itself in its rate
calculations (something Regal does not allege), there is no
mathematical way in which it *could have* raised the rate above
the 7% required for the loan to be considered unfair under
*Fremont*.[2]

The third *Fremont* characteristic is that the loan was made
to a borrower for whom the debt-to-income ratio would have
exceeded fifty percent as measured by the fully-indexed rate.
Here, Regal alleges that this has occurred.  However, she only
alleges conclusorily that, at a certain point, she had to pay
approximately 75% of her monthly income to Wells Fargo on the
loan.  She provides no information to support either the
contention that the rate and principal were such that she had to
pay the alleged $3,186 per month, nor does she provide any
evidence that her income was indeed $4,000 at the time of the

---

[2] I emphasize, however, that just because the rate for this
particular mortgage did not climb above the boundary demarcating
predatory rates does not mean that it was not structured in a
predatory fashion.  As it happens, the housing crisis and the
corresponding plunging Treasury bond rates are what prevented
this loan from reaching predatory interest rates.  For example,
had rates reached as high in September, 2008 (when the rate
could have been adjusted) as they did in the early months of
2007 (when they reached 5.1%) the rate would have crossed the
boundary between an acceptable loan and a predatory one, and
nothing about the structure of the loan would have stopped it
from doing so.  Thus, although the mortgage rate never reached
predatory heights in this case, when executed, it had the
potential to do so and that potential is the focus of the second
Fremont factor.

loan's origination.  It may be that the fully-indexed rate created the kind of situation that would satisfy the third prong of *Fremont*.  But the allegations contained in Regal's complaint are just the kind of conclusory allegations that do not pass 12(b)(6) muster.  As a result, I must conclude that nothing in the complaint supports the contention that, at any point, Regal paid more than 50% of her monthly income on the mortgage.

Finally, under *Fremont*, a loan may be considered predatory if the original loan amount was for 100% of the value of the property being mortgaged or if the loan terms contain a prepayment penalty.  Nowhere do the loan terms contain a prepayment penalty, and undisputed documentation established that the original loan sum of $396,500 was not 100% of the $420,000 at which the property was valued.  *See* Note 1 *supra* and accompanying text.  The value of the loan was apparently approximately 94.4% of the value of the property.  As the Supreme Judicial Court recognized in *Fremont*, whereas the first three characteristics indicate a loan that is "doomed to foreclosure", this fourth factor is designed to expose loans the terms of which make it "essentially impossible for subprime borrowers to refinance unless housing prices increase[]" because the borrower likely will not have built up enough equity in the property to refinance the mortgage when necessary.  *Fremont*, 452 Mass. at 740.  Given the terms of the loan and its high initial

debt-to-value ratio, Regal would have had enough equity in the underlying property under the equations embedded in *Fremont* credibly to seek a refinancing at a later point.

After analyzing these factors, I find that Regal has not adequately pled that Wells Fargo's loan was predatory under the *Fremont* gloss to Chapter 93A.

> b.    *Would a Predatory Loan Claim be Time-Barred Under Chapter 93A?*

I have analyzed the factors in depth to determine both the plausibility of the predatory loan claim and also to determine what Regal would have known when the loan originated.[3]  Having done so, I conclude that even if I found the loan to be unfair under Chapter 93A as predatory, Regal's claims based on such a finding would be time-barred.  Regal had all of the information she needed to allege an unfair loan claim when the loan was originated in 2004.  Nothing changed with respect to the terms of original loan since 2004.  Whether calculated as of the date this litigation was initiated in 2014 or when *Fremont* crystallized the law of predatory loans in 2008, any alleged injury that occurred was well before the 4-year limitations period prescribed for allegations of Chapter 93A injuries.

---

[3] I note that the alleged HAMP violation, if adequately made out — which I conclude she has not — would not be time barred because the 2011 failure to explain the HAMP rejection occurred less than four years before the commencement of this action.

I must also observe that, even if this claim had been brought within the window provided by the statute of limitations, Regal has failed to allege that she has suffered any cognizable injury, as required by Ch. 93A.

> The invasion of a consumer's legal right . . . without more, may be a violation of G.L. c. 93A, § 2 . . . but the fact that there is such a violation does not necessarily mean the consumer has suffered an injury or a loss entitling her to at least nominal damages and attorney's fees; instead, the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself.

*Tyler* v. *Michaels Stores, Inc.*, 464 Mass. 492, 503 (2013). Normally, "injury under chapter 93A means economic injury in the traditional sense." *Rule* v. *Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 255 (1st Cir. 2010).

Simply because the loan that she took out with Wells Fargo might be characterized as predatory does not mean that Regal is relieved of the obligation of alleging measurable financial harm.

### III. CONCLUSION

For the foregoing reasons, I hereby GRANT Wells Fargo's Motion to Dismiss.  The Clerk shall enter a judgment of dismissal.  The Clerk is further directed to send a copy of this

Memorandum and the resulting Judgment to plaintiff herself in

light of the disbarment of plaintiff's counsel during the course

of this litigation.[4]


                              */s/ Douglas P. Woodlock*_____
                              DOUGLAS P. WOODLOCK
                              UNITED STATES DISTRICT JUDGE

---

[4] Although plaintiff's counsel neglected to meet his duty of candor to the court by providing timely notice of challenges to his professional integrity, it has come to my attention that following a judgment entered against him arising out of improprieties in connection with foreclosure-related and mortgage assistance services, *see Commonwealth* v. *Zak*, Suffolk Superior Court Civil Action No. 2011-624H (July 14, 2015), he was disbarred.  *See In re: David Zak*, Supreme Judicial Court for Suffolk County No. BD-2015-080 (March 4, 2016).  *See also In re: David Zak*, No. 16-mc-91116-PBS (D. Mass. June 7, 2016) (Judgment of Disbarment as reciprocal discipline based on Commonwealth of Massachusetts disbarment).  Although plaintiff's counsel as directed by the Judgment of Disbarment, ¶ 2.a), filed (albeit not necessarily in a timely fashion) notices of withdrawal in other cases pending in this Court, he did not file such a notice in this case.  Under the circumstances, prudence suggests that the dispositive papers in this case be sent directly by the Clerk to plaintiff herself.